BRETT L. TOLMAN (UTAH BAR: #8821)
THE TOLMAN GROUP
E-mail: brett@tolmangroup.com
13827 Sprague Ln
Suite 220
Draper, Utah 84020
Telephone: 801.639.9840

CHARLES WEIR
MANATT, PHELPS & PHILLIPS, LLP
E-mail: cweir@manatt.com
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Telephone: 310.312.4280
Facsimile: 310.312.4224

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UHS OF PROVO CANYON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BLISS,<br><br>Defendant. | Case No.: 2:24-cv-00163-DAK<br><br>**COMPLAINT** |

## COMPLAINT (INJUNCTIVE RELIEF REQUESTED)

1. Plaintiff UHS of Provo Canyon, Inc. d/b/a Provo Canyon School ("Provo") brings this action against Defendant Robert Bliss (hereinafter "Robert Bliss" or "Bliss").

## INTRODUCTION

2. Plaintiff Provo is a licensed, accredited psychiatric treatment facility dedicated to the treatment of vulnerable patients between the ages of 12-17 years old. Due to the highly sensitive nature of the services it provides and the adolescent patients it serves, Provo's agreements with its staff members contain strict confidentiality provisions.

3. Robert Bliss is a social media activist and filmmaker. His videos focus on a variety of social issues—from homelessness, to racism, to internet neutrality. Some of his videos have gone viral yielding millions of views.

4. Bliss kept his filmmaking career a secret when he sought a job as a mental health technician at Provo and applied for the position under entirely false pretenses.

5. On information and belief, after he was hired, he proceeded to covertly film and record adolescent psychiatric patients without consent in violation of privacy laws and in breach of the confidentiality provisions he agreed to upon his hiring, but never intended to uphold.

## THE PARTIES

6. Provo is an intensive, psychiatric youth residential treatment center in Utah. Provo has two campuses in Provo and Springville, Utah. Both campuses are licensed by the State of Utah and Department of Human Services and are accredited by the Northwest Accreditation Commission and The Joint Commission. Provo has diagnostically focused programs, designed to treat behavioral disorders and substance abuse, among other conditions. Provo is a Delaware corporation.

7. On information and belief, Defendant Robert Bliss is a resident of Grand Rapids, Michigan where he is registered to vote. He is a filmmaker and producer, online content creator, and activist.

## JURISDICTION AND VENUE

8. The Court has jurisdiction under 28 U.S.C. § 1331 because Bliss has acted in violation of the Federal Wiretap Act, 18 U.S.C. § 2510 et seq. Alternatively, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because Bliss is not a citizen of the same state as plaintiff; and the matter in controversy exceeds $75,000.

9. Venue is proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events that are the subject matter of this lawsuit occurred in this judicial district, and Provo is located in this District.

## FACTUAL ALLEGATIONS

### Bliss's Activism and Film Making

10. Bliss has over 73,900 subscribers to his YouTube channel where he posts videos highlighting social issues.

11. For example, Bliss directed and produced a video "make over" of a homeless veteran. The video went viral across multiple platforms, including his own YouTube channel with over 29 million views.

12. On December 12, 2017, Bliss again spotlighted homelessness in a video he posted to YouTube demonstrating how to "Hijack Amazon Prime Now for Good". The video went viral and has over 2 million views.

13. On January 29, 2018, Bliss posted a video titled "Restoring Automotive Freedom at the FCC" in which he wore a video camera on his bicycle helmet and filmed his disruption of traffic in protest of the FCC's end to net neutrality. The video has over 207,000 views.

14. July 27, 2020, Bliss posted a video titled "Holding a Black Lives Matter Sign in America's Most Racist Town" and filmed people's reactions in Harrison, Arkansas to his holding a Black Lives Matter sign. The video went viral and has 12 million views on his account, in addition to visibility via posts and shares on other accounts, as well as other media coverage.

15. Bliss further appears to have a Twitter/X account with 16,600 Followers and 1,733 posts to date (this is a private account, accessible only to his approved Followers). He also

has a Facebook account that is marked private but mentioned by others who credit him for assets that are posted/shared.

**Bliss Applies for a Position with Provo Under False Pretenses**

16. Bliss sought employment with Provo under entirely false pretenses. Rather than seeking to join the Provo staff's efforts to care for vulnerable, young patients in need of trustworthy staff, on information and belief, Bliss was collecting content for what he hoped would be his next viral video.

17. In or around December 2023, Bliss applied for the position of Mental Health Technician / Student Life Mentor at the Springville campus of Provo Canyon School.

18. The Student Life Mentor's purpose is to "Supervise patients in their daily activities. Provide a positive role model for patients in personal dress, grooming, attitude, and behavior."

19. One of the key aspects of the role was to monitor patients. For example, major job responsibilities include:

- Be aware of patients that are high security risks or supervision risks, and provide added emphasis on their supervision.
- Monitor behavior of patients, maintaining an atmosphere of dignity and respect towards patients and other staff at all times.
- Assist in patient self-administration of medication while supervising off-grounds activities.

20. Among the "Qualifications Required At Entry" for the position are "ability to maintain information as highly confidential."

21. On January 23, 2024, Bliss interviewed with Provo for the position. Bliss falsely represented he had a genuine interest in the position.

22. Bliss claimed on his resume that he held a position as a "Transport Agent" with a company called Safeguard he was employed with in 2023. Safeguard provides transportation for adolescents with behavioral disorders. Bliss claims he was "responsible for safe transport of challenged youth" and that his role had a "focus on safety prioritization."

23. Bliss also claimed in his resume that from 2012-2013 he was a "Wilderness Field Guide at Vision Quest," a wilderness therapy program for "troubled youths." Provo was unable to confirm whether Bliss in fact worked at the wilderness therapy program because of the length of time that has since passed.

24. Bliss provided work experience from 2012-2023 in his application to Provo. Nowhere in the resume does he mention he is a filmmaker, nor did he divulge this during the interview process in reference to his background.

25. On January 25, 2024, Provo offered Bliss the position and Bliss accepted the offer that same day.

**Bliss's Agreements with Provo**

26. On January 30, 2024, Bliss signed several agreements with Provo as part of his onboarding.

27. Among those agreements, Bliss signed a Confidentiality Agreement on January 30, 2024, attached as **Exhibit 1**. The Confidentiality Agreement states:

> As a condition of employment at Provo Canyon School, I agree not to divulge any information (i.e. written, verbal, photographs) concerning persons receiving services to any unauthorized person(s) or in any way to make such information public.
>
> I agree to follow the legal regulations concerning a patient's PHI (Protected health Information) as outlined by the Health Insurance Portability and Accountability Act. I understand that I am required by federal and state law to protect the privacy of our current and discharged patients and their treatment while at this facility.

> I understand that unauthorized release of confidential information may make me subject to a civil action under provisions of the Welfare and Institution Code. I also understand that the release of this information will make me subject to immediate dismissal from this facility.

28. The Applicant Acknowledgement, attached as **Exhibit 2**, further includes a confidentiality provision Bliss agreed to:

> Employees and visitors often receive specific information concerning residents (i.e., residents includes but is not limited to, patients, students, etc.) and their illness. This information is strictly confidential and should never be discussed with other residents, visitors, fellow employees, family or friends. All employees and visitors must fully understand that any information they receive concerning residents and/or activities is confidential information.

29. On January 30, 2024, Bliss executed an acknowledgement of the Position Description, attached as **Exhibit 3**, including the major job responsibilities for the position of Student Life Mentor and the "Qualifications Required At Entry" cited above.

30. Bliss also signed an Alternative Resolution for Conflicts ("ARC") Agreement. The ARC agreement provides for arbitration of workplace disputes but allows for a party to the agreement to "apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy. . .."

**<u>Bliss Becomes a Provo Employee</u>**

31. At all times while on Provo premises, Bliss curiously wore a baseball cap and a pair of sunglasses; the sunglasses were typically affixed to the brim of the baseball cap.



32. Bliss claimed he had a light sensitivity condition requiring the cap and sunglasses be with him at all times. But Bliss rarely, if ever, wore the sunglasses over his eyes while at Provo. And in photos of him on his social media pages and in his prior films, Bliss is not wearing a cap or sunglasses at all.

33. Every time Bliss was observed entering a Provo building, he wore the cap with the sunglasses positioned on top of the brim. He was also observed adjusting them, and was also observed pushing a button on the glasses.

34. As soon as he had access to Provo, Bliss began staging footage. For example, on January 30, 2024, he attempted to set up meetings with a Provo Program Manager under false pretenses, texting him: "Hey Justin would you have any time to meet this week? I'm hoping to grow my career in this industry and you know it so well that I'd be [sic] valuable to get your thoughts and learn from you."

35. Bliss's new hire orientation began on February 12, 2024 thru February 15, 2024; he attended the Provo campus from 8:00 a.m. to 4:00 p.m. on those days.

36. On the first day of orientation, Bliss received keys to the facility.

37. The orientation was a classroom-based training in which Bliss primarily interacted with facility employees and other new hires.

38. Bliss had some interaction with patients during the orientation as well. In one instance, a female and a male patient joined the new employees to answer questions about Provo, and Bliss was also observed passing three male patients in the hallway at another point during the training.

39. As part of the orientation, Bliss received a training binder with outlines of training curriculum and other training programs and materials, which he took with him and never returned to Provo.

40. For example, the materials included the "Class Curriculum" for new hires, a detailed presentation spanning topics from employee benefits and staff expectations to clinical orientation materials.

41. The materials contained additional Provo policies and procedures, such as those relating to supervision and observation of patients, confidentiality and privacy, safety, professionalism, and treatment interventions.

42. The training materials retained by Bliss further include sensitive information relating to Provo's operations, such as the facility's procedural and emergency codes—all of which would threaten Provo's patients and staffs were they to be disseminated to the general public.

43. When Bliss finished orientation, he began his role as a Student Life Mentor at the Springville campus and worked shadow shifts in which he shadowed other staff members.

44. During his shadow shifts, Bliss had access to patient observation documents, including a form commonly called a "Q15" (representing 15-minute checks). These resident

observation forms account for where patients are spending their time, what activities they're partaking in, their disposition/behavior, and appearance. The forms contain additional highly confidential PHI, such as special precautions and risk alerts, (e.g., verbalizing suicidal thoughts, sexual victimization, self-harm, etc.), and narratives communicating progress or need for continued treatment.

45. On February 16, Bliss worked from 8:00 a.m. to 4:00 p.m. and attended a tour of the boys' program area of the school and shadowed the girls' program staff. Bliss saw approximately 35 patients throughout that day. Bliss had access to approximately 42 patients' observation documents during the shift.

46. Between February 19 and February 23, Bliss worked shifts from approximately 2:00 p.m. to 10:00 p.m. During the first hour of the shifts, Bliss met with the training coordinator to review program specific protocols and expectations. The rest of the shift consisted of shadow shifts in which Bliss followed staff and interacted with patients.

47. On February 19 and 20, Bliss shadowed a staff member in the Provo Peak Cottage. There were 10 female patients assigned to the cottage at the time and Bliss had access to the observation documents for those patients assigned to the cottage.

48. On February 21, he worked with two other staff members in the Mt. Timpanogos Cottage. There were 13 female patients assigned to the cottage at the time and Bliss had access to their observation documents.

49. On February 22, Bliss worked on the Lone Peak Cottage with five other staff members and there were 14 female patients assigned the cottage. Bliss again had access to those patients' observation documents. The Lone Peak Cottage is a stabilization and assessment

cottage. Patients are moved there when they exhibit an increased safety risk and require more intensive programming and observation.

50. On February 23, Bliss again worked on the Lone Peak Cottage, this time with four other staff members. There were 12 female patients assigned to the cottage that day and Bliss had access to their observation documents.

51. Bliss left his final shift on February 23 at 9:30 p.m., without reporting to his manager before leaving.

52. As Bliss's first week of shadow shifts progressed, Bliss was observed more frequently approaching patients and attempting to engage them in card games and conversations.

53. Toward the end of the week, Bliss was also observed using his phone to take several pictures in the building.

54. At one point, a patient was observed handing Bliss handwritten papers and Bliss proceeded to angle his glasses at each page. He was then seen taking the papers into the bathroom (where there are no video cameras), and then leaving the bathroom and returning the papers to the patient.

55. Other odd behaviors included leaving units to go into a staff area to check his phone, frequent use of the bathroom, and adjusting his shirt in ways that indicate there may have been something underneath his shirt (such as another recording device).

56. A staff member who accompanied Bliss during his February 23 shift noticed Bliss was acting strange around the patients. Instead of sticking to the normal check ins, like those contemplated by the Q15, the staff member noticed Bliss interviewing the patients regarding their experiences at the school, including questioning how often they "see sunlight". This

conversation was out-of-scope and inappropriate for anyone in the role or of Bliss' minimal tenure.

57. After the staff member noticed and reported Bliss's behavior on February 23, staff at Provo researched his name online and uncovered Bliss's career as an activist filmmaker.

58. On February 24, Bliss was not scheduled for a shift. But Bliss nevertheless arrived at Provo and entered the facility for approximately six minutes. Upon entering, Bliss went directly to the Lone Peak Cottage. During the six minutes, he accessed three different areas, and each time appeared to stand in the corner of the room slowly scanning the room's contents.

59. Staff had planned to meet Bliss upon arrival at the door for his afternoon shift and confront him on February 25, 2024, but on February 24, 2024, Bliss texted the Provo Program Manager that he would not be coming to work: "got some bad news about my family and need to head back to Michigan, will have to stay there for a while and suspend my employment indefinitely."

60. On the afternoon of February 27, 2024, Bliss returned to the facility to return his keys.

61. Provo's Chief Executive Officer, Tim Marshall, met Bliss at the door and, hoping to better understand what happened while Bliss was employed as well as the circumstances of his abrupt departure. Marshall asked him to come into his office to discuss. Bliss responded he couldn't because he had some place to be, and that he had just come to return his keys.

62. Marshall asked Bliss why he had quit so abruptly, and if there was anything Bliss wanted to disclose. Bliss responded only that something personal had come up and that he had to go. When Marshall asked him again to discuss matters, Bliss abruptly yelled, "Am I being

detained?" Marshall responded that he was not being detained and unlocked the doors (which remain locked at all times, as per facility protocol to protect patients) to let Bliss out.

63. Bliss immediately exited the facility. While he was leaving, he did not acknowledge or respond when Marshall asked Bliss whether he wanted his paycheck and how Provo should arrange his pay. Instead, Bliss walked directly to his car and left.

64. In order to protect the privacy of Provo's patients, staff and management, Provo was forced to bring this complaint to recover illegally acquired recordings, patient health information, sensitive facility training documents, and information about the facility. Provo also seeks to prohibit Bliss from reporting on his inappropriate and illegal employment.

## FIRST CAUSE OF ACTION

### (Violation of the Federal Wiretap Act (18 U.S.C. § 2510 *et seq.*))

65. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

66. On information and belief, on each and every occasion Bliss entered the Provo properties, he did so wearing a surreptitious video and audio recording device, intending to record oral communications of Provo employees and patients.

67. On information and belief, Bliss took video and audio recordings of conversations by person(s) "exhibiting an expectation that the communication is not subject to interception, under circumstances justifying that expectation." 18 U.S.C. §§ 2510(2), 2511.

68. No one consented to Bliss's recording, indeed, they did not realize he was recording because he hid that he was a filmmaker and wore hidden devices. He inevitably recorded conversations while there to which he was not a party and for which there was no

consent. To the extent Bliss was party to the conversation, he did so for purposes of committing a tortious act.

69. Bliss sought to intercept these oral communications among patients and staff at Provo. He did not do so within the ordinary course of business nor in the normal course of his employment.

70. Privacy and confidentiality is paramount at Provo. Provo and its patients have the reasonable expectation of privacy in their conversations. Federal and state law protect the privacy of the residents and all staff members sign strict confidentiality agreements similar to the one signed by Bliss. Patients and their families trust the facility will uphold privacy laws during the vulnerable times they seek care from Provo. And certainly no one anticipates their children seeking care during a time of need and sensitivity will end up on YouTube.

71. Provo did not authorize or otherwise give permission to Bliss to intercept the oral communications for which it had a reasonable expectation of privacy, and thus the conduct was in clear violation of the Federal Wiretap Act.

72. In addition to actual damages, Provo is further entitled to recover statutory damages including punitive damages, attorney's fees, and court costs under 18 U.S.C. § 2520.

## SECOND CAUSE OF ACTION

**(Violation of Utah Interception of Communications Act, Utah Code Ann. § 77-23a *et seq.*)**

73. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

74. On information and belief, on each and every occasion Bliss entered the Provo properties, he did so wearing a surreptitious video and audio recording device, intending to record oral communications of Provo employees and patients.

75. On information and belief, Bliss took video and audio recordings of conversations by person(s) "exhibiting an expectation that the communication is not subject to interception, under circumstances justifying that expectation." Utah Code Ann. §§ 77-23a-3(13), 77-23a-4.

76. No one consented to Bliss's recording, indeed, they did not realize he was recording because he hid that he was a filmmaker and wore hidden devices. He inevitably recorded conversations while there to which he was not a party and for which there was no consent. To the extent Bliss was party to the conversation, he did so for purposes of committing a tortious act.

77. Bliss sought to intercept these oral communications among patients and staff at Provo. He did not do so within the ordinary course of business nor in the normal course of his employment.

78. Privacy and confidentiality is paramount at Provo. Provo and its patients have the reasonable expectation of privacy in their conversations. Federal and state law protects the privacy of the residents and all staff members sign strict confidentiality agreements similar to the one signed by Bliss. Patients and their families trust the facility will uphold privacy laws during the vulnerable times they seek care from Provo. And certainly no one anticipates their children seeking care during a time of need and sensitivity will end up on YouTube.

79. Provo did not authorize or otherwise give permission to Bliss to intercept the oral communications for which it had a reasonable expectation of privacy, and thus the conduct was in clear violation of Utah law.

80. In addition to actual damages, Provo is further entitled to recover statutory damages including punitive damages, attorney's fees, and court costs under Utah Code Ann. § 77-23a-11.

**<u>THIRD CAUSE OF ACTION</u>**

**(Breach of Contract)**

81. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

82. Bliss entered into a Confidentiality Agreement, and also executed an Applicant Acknowledgement and Position Description containing confidentiality provisions, with Provo, in exchange for employment and other consideration.

83. Upon information and belief, Bliss used additional recording devices in addition to those affixed to his glasses, including but not limited to two different phones he was seen with on the premises.

84. Bliss has breached his obligations under the Confidentiality Agreement, the Applicant Acknowledgement, and the Position Description he signed off on by surreptitiously recording patients and staff members at the facility.

85. On information and belief, the recordings also captured patient records and information that is protected by Utah and Federal laws, including 42 C.F.R. Part 2 (HIPAA Substance Use Disorder regulations) and the Utah Substance Use Disorder Counselor Act (Utah Code Ann. 1953 § 58-60-509).

86. Bliss now holds the confidential information in violation of the Agreement, and, on information and belief, intends to disseminate the information in the form of a film or one or more video episodes of the facility and its patients.

87. As a direct and proximate result of the breach, Provo has and/or will suffer economic and irreparable harm caused by Bliss's breaches, including harm to the safety, security, and privacy of Provo patients and staff members. This further includes economic and

irreparable harm in being forced to divert resources to combat Bliss's HIPAA and other privacy violations.

**FOURTH CAUSE OF ACTION**

**(Fraudulent Misrepresentation)**

88. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

89. On January 23, 2024, Bliss attended an interview in which he represented to Provo he was applying for the position of a Mental Health Technician/Student Life Mentor. He represented he was capable and willing to take on the job responsibilities associated with the role.

90. After accepting the position, on January 30, 2024, Bliss executed several agreements, including agreeing to protect the confidentiality and privacy of Provo's patients. *See* **Exhibit 1**.

91. Those representations were material to Provo's decision to hire and onboard Bliss.

92. Bliss knew the representations were false. Indeed, as soon as Bliss stepped foot on the Provo campuses, upon information and belief, he began recording for his next project with the intent to disseminate to millions of potential viewers.

93. Bliss made the representations for purposes of inducing Provo to hire him and permit him access to the facilities and provide him with confidential information, including Provo's training program.

94. Provo reasonably relied on the representations and has and/or will suffer economic and irreparable harm caused by Bliss's representations, including harm to the safety, security, and privacy of Provo patients and staff members. This further includes economic and

irreparable harm in being forced to divert resources to combat Bliss's HIPAA and privacy violations.

**FIFTH CAUSE OF ACTION**

**(Trespass)**

95. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

96. Bliss fraudulently induced Provo to hire him under false pretenses to gain entry to Provo.

97. Based on representations made by Bliss, including in his Confidentiality Agreement with Provo, Provo permitted Bliss to gain entry to the two Provo campuses.

98. Bliss entered the Provo campus for his new-hire orientation on various days between February 12 and February 15.

99. Bliss entered the Springhill campus to work shadow shifts, accompanying other staff members and monitoring patients, on February 16 and 19-23.

100. On those dates, Bliss wrongfully entered the properties and unlawfully filmed the premises in violation of the Confidentiality Agreement he had executed and the HIPAA regulations to which he was bound.

101. As a direct and proximate result of Bliss's trespass, Provo has suffered and continues to suffer economic and irreparable harm including being forced to divert resources to combat Bliss's HIPAA and privacy violations.

102. In addition to compensatory damages, Provo seeks punitive damages in light of Bliss's willful and malicious trespass in knowing violation of Provo's and its patients' rights.

**SIXTH CAUSE OF ACTION**

**(Intrusion Upon Seclusion)**

103. Provo incorporates by reference all paragraphs above as though set forth completely within this section.

104. Provo has suffered an intentional substantial intrusion of their privacy when Bliss obtained employment with Provo under false pretenses, brought a video recording device on the premises, and filmed and/or recorded patients.

105. Bliss unlawfully intercepted conversations at Provo without any patient or staff member's consent and with the purpose of unlawfully disseminating the confidential conversations.

106. As a direct and proximate result of Bliss's intrusion, Provo has suffered and continues to suffer economic and irreparable harm including being forced to divert resources to combat Bliss's HIPAA and privacy violations.

## SEVENTH CAUSE OF ACTION

**(Conversion)**

107. Bliss received training materials in connection with his hiring at Provo.

108. The training materials are the property of Provo.

109. Bliss wrongfully obtained the training materials when he was hired under false pretenses.

110. Provo has and/or will suffer economic and irreparable harm caused by Bliss's retention of the materials and, upon information and belief, his intended dissemination of those materials.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. Preliminary and permanent injunctive relief as follows:

   a. Enjoin Bliss from publishing or otherwise disclosing, posting, sharing, uploading, downloading, transferring, or any other means of disseminating, to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned while employed by Provo;

   b. Enjoin Bliss from publishing or otherwise disclosing to any third party any Patient Health Information or other records or physical documents Bliss obtained while at Provo or otherwise obtained pertaining to any Provo patient;

   c. Enjoin Bliss from reporting or otherwise sharing information relating to his inappropriate and illegal employment;

   d. Require Bliss to return to Provo any and all video, audio, photographic or other recordings taken at any Provo facility;

   e. Require Bliss to return any and all confidential information and PHI obtained from Provo, including any information or documents received from Provo's staff and any patients;

   f. Require Bliss to return any and all training materials received in connection with his orientation and hiring at Provo;

   g. Require Bliss to certify he has not disseminated materials to any person or otherwise uploaded or transmitted the materials to any server or cloud;

   h. Enter an Order requiring Bliss to preserve all documents and communications relating to his scheme, including communications with anyone who may have been involved in hatching the scheme; and,

   i. After returning any of the property referenced above, require Bliss to destroy any and all copies of any such materials within his possession, custody, or control.

B. Compensatory damages in such amounts as the Court deems just and proper;

C. Statutory penalties and damages in such amounts as the Court deems just and proper;

D. Attorneys' fees as available by any applicable law;

E. Any other relief that the Court deems just and proper.