BRETT L. TOLMAN (UTAH BAR: #8821)
THE TOLMAN GROUP
E-mail: brett@tolmangroup.com
13827 Sprague Ln
Suite 220
Draper, Utah 84020
Telephone: 801.639.9840

CHARLES WEIR
MANATT, PHELPS & PHILLIPS, LLP
E-mail: cweir@manatt.com
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Telephone: 310.312.4280
Facsimile: 310.312.4224

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UHS OF PROVO CANYON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BLISS,<br><br>Defendant. | Case No.: 2:24-cv-00163-DAK<br><br>**DECLARATION OF TIM MARSHALL** |

I, Tim Marshall, declare as follows:

1. I am over 18 years old. I have personal knowledge of the following facts. If called as a witness in this action, I could and would testify competently to these facts.

2. I am currently employed by UHS of Provo Canyon, Inc. ("Provo") as the Chief Executive Officer. I have been with the company since August 3, 2009.

3. Provo is an intensive, psychiatric youth residential treatment center in Utah dedicated to the treatment of vulnerable patients between the ages of 12-17 years old.

4. Provo has two campuses in Provo and Springville, Utah. Both campuses are licensed by the State of Utah and Department of Human Services and are accredited by the Northwest Accreditation Commission and The Joint Commission.

5. Provo has diagnostically focused programs, designed to treat behavioral disorders and substance abuse, among other conditions.

6. Because of the highly sensitive nature of the services that Provo provides and the adolescent patients Provo serves, protecting the privacy of Provo's patients is paramount.

7. Provo's agreements with its staff members contain strict confidentiality provisions including acknowledgements of the highly sensitive nature of the work and the legal regulations concerning patient protected health information ("PHI"). *See, e.g.,* Applicant Acknowledgement attached as **Exhibit 1**.

8. Robert Bliss applied for the position of a mental health technician / Student Life Mentor at Provo in December 2023. *See* Position Description attached as **Exhibit 2**.

9. Bliss interviewed for the position on January 25, 2024.

10. Bliss did not disclose his filmmaking career when he applied for the job in his resume or otherwise during the hiring process. *See* Resume of Robert Bliss attached as **Exhibit 3**.

11. In Bliss's resume, he claimed to have experience working with the type of patients Provo served. *See* **Exhibit 3**.

12. As Provo has come to learn, his resume omitted numerous items about his background and work history.

13. Bliss was offered the position subject to background checks and his background checks were all clean.

14. On January 30, 2024, Bliss executed several acknowledgements and agreements with Provo, including a Confidentiality Agreement. *See* Confidentiality Agreement as **Exhibit 4**.

15. Bliss signed additional acknowledgements regarding the highly confidential nature of the position, including the Position Description for Student Life Mentor, *see* **Exhibit 2**.

16. Provo had no reason to doubt that Bliss wanted to be part of the team committed to serving Provo's patients.

17. Bliss also claimed during the hiring process that he had a light photosensitivity condition requiring him to wear a baseball cap with a brim and sunglasses at all times. In fact, based on review of surveillance footage, it does not appear that he wore the sunglasses. Instead, they were usually on the brim of his cap.

18. Provo later learned, upon information and belief, that there was a hidden camera affixed to the sunglasses, which was the real reason he wore them affixed to his cap—to gain footage of the premises.

19. Provo now believes Bliss surreptitiously recorded and photographed patients and staff members at the facility and various documents containing confidential patient information.

20. Bliss also falsely represented that he was interested in a future career in the mental health industry so as to set up an interview with the Provo program manager. *See* Jan. 30, 2024 Text Message between Robert Bliss and Provo Program Manager attached as **Exhibit 5**.

21. Bliss attended a new hire orientation at Provo between February 12 – February 15, 2024.

22. During the new hire orientation, Bliss was observed mostly interacting with other staff and new hires but had some form of interaction (while wearing his hat and affixed sunglasses) with at least five patients as well.

23. Like all new hires, Bliss also received a key to the facility on his first day of the orientation.

24. As part of the orientation, Bliss received voluminous training programming and materials. This included eleven different documents and presentations.

25. For example, Bliss received a 124-page Class Curriculum, policies relating to supervision and safety, and competency assessments for the Student Life Mentor role. The training materials further contained sensitive operational information, such as evacuation procedures and emergency shutoffs (e.g., specific instructions on how to shutoff the sprinkler system)—the dissemination of which could pose a threat to Provo staff safety if the materials were to fall into the hands of someone who wanted to cause harm to the facility or those in it.

26. Bliss took the materials with him and has not returned them to Provo.

27. After orientation, Bliss began shadow shifts in which he would shadow a staff member assigned to a group (or "cottage") of patients.

28. The shadow shifts occurred on five different days, on February 16 and February 19 – 23.

29. During those shifts, Bliss had regular interactions with both staff and patients.

30. For example, on February 22 and 23, Bliss was assigned to the Lone Peak Cottage, a stabilization and assessment cottage where patients are moved when they have exhibited an increased safety risk and require more intensive programming and observation.

31. Throughout his shadow shifts, Bliss had access to patient observation documents, including a form commonly called a "Q15" which accounts for where patients are spending their time, as well as more detailed clinical information, such as patient risk factors like suicidal thoughts or sexual victimization. *See* blank Q15 form is attached as **Exhibit 6**.

32. Throughout these shifts, Bliss was observed often adjusting his glasses and even pushing a button on them.

33. Bliss was also observed adjusting his shirt in a way that indicated he may have had another recording device beneath his shirt.

34. Surveillance footage also revealed a patient giving Bliss a stack of papers and Bliss angling his glasses at each page; he then proceeds to take the stack of the papers to the bathroom (where there are no video cameras), and returns and hands them back to the patient.

35. A staff member who worked Bliss's February 23 shift with him noticed Bliss was acting strange around the patients.

36. Instead of sticking to the normal check ins, like those contemplated by the Q15, the staff member noticed Bliss interviewing the patients regarding their experiences at the school, including questioning how often they "see sunlight".

37. This conversation was out-of-scope and inappropriate for anyone with his role or of Bliss's minimal tenure.

38. After learning of the staff member's observation of Bliss, Provo researched Bliss's online presence and uncovered his career as an activist film maker and realized Bliss posed a risk to both staff and patient safety.

39. Staff planned to meet and confront Bliss during his next assigned February 25 shift, but Bliss texted Provo's program manager on February 24 relating that he would not be coming back to work due to "bad news about [his] family" and reported he was heading "back to Michigan, will have to stay there for a while and suspend my employment indefinitely." *See* Feb. 24, 2024 Text message between Robert Bliss and Provo Program Manager attached as **Exhibit 7**.

40. Bliss returned to the facility on February 24, when he was not assigned a shift, entered the property for six minutes and was observed entering three different rooms and scanning the areas before leaving, including the Lone Peak Cottage.

41. Bliss also later returned to the facility on February 27 to return his keys.

42. I met Bliss at the front door of the building that afternoon and asked him to come in my office, hoping to better understand what happened while Bliss was employed and the circumstances of his abrupt departure. Bliss responded he couldn't because he had some place to be, and that he had just come to return his keys.

43. I asked Bliss why he had quit so abruptly and if there was anything Bliss wanted to disclose. Bliss responded only that something personal had come up and that he had to go.

44. When I asked him again to consider coming in to discuss, Bliss abruptly yelled, "Am I being detained?" I responded that he was not being detained and unlocked the doors (which remain locked at all times, as per facility protocol to protect patients) to let Bliss out.

45. Bliss then immediately exited the facility. While he was leaving, he did not acknowledge or respond to me when I asked him whether he wanted his paycheck and how Provo should arrange for his pay. Instead, Bliss walked directly to his car and left.

I declare under penalty of perjury under the laws of the United States that the contents of this declaration are true and correct. Executed on February 29, 2024, in Provo, Utah.

Tim Marshall

402774587.3