BRETT L. TOLMAN (UTAH BAR: #8821)
THE TOLMAN GROUP
E-mail: brett@tolmangroup.com
13827 Sprague Ln
Suite 220
Draper, Utah 84020
Telephone: 801.639.9840

CHARLES WEIR
MANATT, PHELPS & PHILLIPS, LLP
E-mail: cweir@manatt.com
2049 Century Park East
Suite 1700
Los Angeles, California 90067
Telephone: 310.312.4280
Facsimile: 310.312.4224

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UHS OF PROVO CANYON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BLISS,<br><br>Defendant. | Case No.: 2:24-cv-00163-DAK<br><br>**PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND EXPEDITED DISCOVERY ORDER; MEMORANDUM OF POINTS AND AUTHORITIES** |

## SUMMARY OF CASE AND REQUESTED RELIEF

Plaintiff UHS of Provo Canyon, Inc. d/b/a Provo Canyon School ("Provo") is an intensive, psychiatric youth residential treatment center in Utah dedicated to the treatment of its patients. Provo is forced to file this action to prevent the irreparable damage that will ensue if Defendant Robert Bliss releases illegally obtained visual and audio recordings of Provo's patients to an audience of potentially millions.

Bliss applied for a position as a mental health technician at Provo under entirely false pretenses, omitting material information about his past work experience as a viral video producer and social activist. During orientation and while with staff and patients, upon information and belief, Bliss used a hidden camera affixed to his glasses (along with other potential recording devices) and surreptitiously recorded the premises, including the adolescent patients housed in the facility.

Bliss has an extensive social media presence. He has over 73,900 subscribers to his YouTube channel where he posts videos highlighting social issues—the videos have as many as 29 million views. Bliss now possesses extremely confidential, illegally obtained, photos, video and audio recordings of Provo's patients and their records from his tenure pretending to work at the facility. Bliss also obtained and took with him Provo's training materials, including sensitive information relating to Provo's operations. Based on Bliss's past filmmaking, Provo reasonably fears Bliss will disseminate the highly confidential material in hopes of making tomorrow's viral hit.

Bliss's conduct gives rise to multiple claims that support the relief requested by this motion: (1) violation of the Federal Wiretap Act**,** 18 U.S.C. § 2510 *et seq.* based on his surreptitious recordings; (2) violation of the Utah Interception of Communications Act, Utah Code Ann. § 77-23a *et seq*. for the same conduct; (3) breach of contract based on Bliss's flagrant violations of the Confidentiality Agreement he entered into with Provo, as well as breaches of the confidentiality provisions in his Applicant Acknowledgement and Position Description; (4) fraudulent misrepresentation based on Bliss's false statements made during and after the hiring process, which were material to Provo's decision to hire Bliss, provide him with Provo's confidential and proprietary materials he would not have otherwise received, and allow him to

enter the facility; and (5) conversion based on Bliss unlawfully obtaining and retaining Provo's materials.

Bliss's possession of these materials poses an immediate harm and danger in the form of Bliss's intended dissemination of highly confidential and sensitive material, including Provo's patients' PHI by uploading recordings to the internet to potentially millions of viewers. It will be an act that cannot be undone, not by Bliss, not by Provo and not even by this Court—and Provo's adolescent patients and its staff will suffer.

**APPLICATION FOR RELIEF**

Provo hereby applies for a temporary restraining order and an order requiring Defendant Bliss, as well as any persons acting on Bliss's behalf, to show cause why a preliminary injunction should not be issued pending trial in this action as follows:

- Enjoin Bliss from publishing or otherwise disclosing, posting, sharing, uploading, downloading, transferring, or any other means of disseminating, to any third party any video, audio, photographic, or other recordings taken, or any confidential information learned while employed by Provo;
- Enjoin Bliss from publishing or otherwise disclosing to any third party any Patient Health Information or other records or physical documents Bliss obtained while at Provo or otherwise obtained pertaining to any Provo patient;
- Enjoin Bliss from reporting or otherwise sharing information relating to his inappropriate and illegal employment;
- Require Bliss to return to Provo any and all video, audio, photographic or other recordings taken at any Provo facility;
- Require Bliss to return any and all confidential information and PHI obtained from Provo, including any information or documents received from Provo's staff and any patients;
- Require Bliss to return any and all training materials received in connection with his orientation and hiring at Provo;
- Require Bliss to certify he has not disseminated materials to any person or otherwise uploaded or transmitted the materials to any server or cloud;

- After returning any of the property referenced above, require Bliss to destroy any and all copies of any such materials within his possession, custody, or control; and
- Enter an Order requiring Bliss to preserve all documents and communications relating to his scheme, including communications with anyone who may have been involved in hatching the scheme.

Provo asks this Court for a temporary restraining order for preliminary and permanent injunctive relief to prevent Bliss from inflicting further irreparable harm on Provo including Provo's staff and patients. Provo seeks this order on the grounds that: (i) Provo is likely to succeed on the merits of its claims for violation of the Federal Wiretap statute, Utah's Interception of Communications Act, breach of contract, fraudulent misrepresentation, and conversion; (ii) that unless the temporary restraining order is granted, Provo and its patients and staff will suffer irreparable injury in that Bliss intends to disseminate the illegal recordings resulting, among other harm, in numerous HIPAA violations and permanent reputational harm to Provo; and, (iii) that the balance of hardships weighs sharply in Provo's favor, as Bliss will suffer little, if any, pecuniary or constitutional harm if the requested injunction is granted.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## I. **FACTUAL BACKGROUND**

Plaintiff UHS of Provo Canyon, Inc. d/b/a Provo Canyon School ("Provo") is an intensive, psychiatric youth residential treatment center in Utah. Marshall Decl. ¶ 3. Provo has two campuses in Provo and Springville, Utah. Marshall Decl. ¶ 4. Both campuses are licensed by the State of Utah and Department of Human Services and are accredited by the Northwest Accreditation Commission and The Joint Commission. *Id*. Provo has diagnostically focused programs, including among other behavioral disorders, programming dedicated to substance abuse behavior. Marshall Decl. ¶ 5.

Protecting the privacy of Provo's patients is paramount. Marshall Decl. ¶ 6. As a HIPAA covered entity, Provo and its employees are bound to protect Provo's patients' PHI.[1] Provo's agreements with its staff members contain strict confidentiality provisions including acknowledgements of the highly sensitive nature of the work and the legal regulations concerning patient protected health information ("PHI"). Marshall Decl. ¶ 7.

Defendant Robert Bliss is a filmmaker and producer, online content creator, and activist. Tolman Decl. ¶ 2. On his YouTube channel, he has posted videos spotlighting homelessness, racism, and net neutrality. Tolman Decl. ¶ 3, Ex. A. His videos have received as many as 29 million views. Tolman Decl. ¶ 4, Ex. A.

In December 2023, Bliss applied for the position of a mental health technician at Provo under entirely false pretenses—he was not there to be a staff member charged with looking after vulnerable adolescents, but rather, Provo is informed and believes he was there to produce his next viral video. Marshall Decl. ¶¶ 8, 10, 18.

The position of mental health technician does not require a specialized certificate or license but it is an important role in supporting the wellbeing of Provo's patients. The "General Purpose" of the job, as provided for in the Position Description, is to "[s]upervise patients in their daily activities. Provide a positive role model for patients in personal dress, grooming, attitude and behavior." Marshall Decl. ¶ 8, Ex. 2. He applied and interviewed for the position on January 25, 2024. Marshall Decl. ¶ 9. In his resume, he claimed to have experience working with

---

[1] PHI includes all "individually identifiable health information" in any form or media, whether electronic, paper, or oral. 45 C.F.R. § 160.103. More specifically, "Individually identifiable health information" is information, including demographic data, that relates to: the individual's past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual. 45 C.F.R. § 160.103.

the type of patients Provo served. Marshall Decl. ¶ 11, Ex. 3. As Provo has come to learn, his resume also omitted numerous items about his background and work history. Marshall Decl. ¶ 12. He was offered the position subject to Provo's background checks. His background checks came back entirely clean and gave Provo no cause for concern. Marshall Decl. ¶ 13.

On January 30, 2024, Bliss executed several acknowledgements and agreements with Provo, including a Confidentiality Agreement. Marshall Decl. ¶ 14, Ex. 4. Bliss agreed therein not to divulge patient information to the public and further acknowledged he understood and agreed to abide by federal and state privacy laws. *Id.* Bliss signed additional acknowledgements regarding the highly confidential nature of the position. Marshall Decl. ¶ 15, Exs. 1, 2. Bliss never intended to uphold his obligations given his real purposes in seeking employment with Provo.

Bliss also claimed he had a light photosensitivity condition requiring him to wear a baseball cap with a brim and sunglasses at all times—in fact, this was his way of duping Provo so as to let him wear a hidden camera throughout the duration of his time at the facility. Marshall Decl. ¶ 17. Bliss rarely wore the sunglasses at all, instead keeping them affixed to the top of his baseball cap. Marshall Decl. ¶¶ 17-18. In publicly available videos and photos of Bliss prior to his hiring, he is not seen wearing a sunglasses or cap. Tolman Decl. ¶ 5, Exs. A, B, C, and D.

Bliss attended a new hire orientation between February 12 – February 15, 2024. Marshall Decl. ¶ 21. During the orientation, Bliss mostly interacted with other staff and new hires, but had some form of interaction (while wearing his hat and affixed sunglasses, of course) with at least five patients. Marshall Decl. ¶ 22. He also obtained keys to the facility and voluminous training materials containing, among other things, sensitive operational information, such as evacuation procedures and emergency shutoffs (e.g., specific instructions on how to shutoff the sprinkler

system)—the dissemination of which could pose a threat to Provo staff safety if the materials were to fall into the hands of someone who wanted to cause harm to the facility or those in it. Marshall Decl. ¶ 25. Bliss took the materials with him and has not returned them to Provo since. Marshall Decl. ¶ 26.

After orientation, Bliss began shadow shifts in which he would shadow a staff member assigned to a group (or "cottage") of patients. Marshall Decl. ¶ 27. The shifts occurred on five different days, on February 16 and February 19 – 23. Marshall Decl. ¶ 28. During those shifts, Bliss had regular interactions with patients. For example, on February 22 and 23, Bliss was assigned to the Lone Peak Cottage, a stabilization and assessment cottage where patients are moved when they've exhibited an increased safety risk and require more intensive programming and observation. Marshall Decl. ¶ 40.

Also, throughout his shadow shifts, Bliss had access to patient observation documents. Marshall Decl. ¶ 31. These include a form commonly called a "Q15" which accounts for where patients are spending their time, as well as more detailed clinical information, such as patient risk factors like suicidal thoughts or sexual victimization. Marshall Decl. ¶ 31, Ex. 6.

At times, Bliss was observed adjusting his glasses and pushing a button on them. Marshall Decl. ¶ 32. He was observed adjusting his shirt in a way that indicated he may have had another recording device beneath. Marshall Decl. ¶ 33. And perhaps most suspicious, Provo later learned through review of surveillance footage that a patient gave Bliss a stack of papers and Bliss was observed angling his glasses at each page, proceeding to take the stack of the papers to the bathroom (where there are no video cameras), and then returning and handing the papers back to the patient. Marshall Decl. ¶ 34.

A staff member who accompanied Bliss during his February 23 shift noticed Bliss was acting strange around the patients. Marshall Decl. ¶ 35. Instead of sticking to the normal check ins, like those contemplated by the Q15, the staff member noticed Bliss interviewing the patients regarding their experiences at the school, including questioning how often they "see sunlight". Marshall Decl. ¶ 36. These conversations were out-of-scope and inappropriate for anyone in role or with Bliss's minimal tenure. Marshall Decl. ¶ 37 .

After learning of the staff member's observation of Bliss, Provo researched Bliss's online presence and uncovered his career as an activist film maker. Marshall Decl. ¶ 38. Staff planned to meet and confront Bliss during his next assigned February 25 shift, but he texted Provo's program manager on February 24 relating that he would not be coming back to work due to "bad news about [his] family" and reported he was heading "back to Michigan, will have to stay there for a while and suspend my employment indefinitely." Marshall Decl. ¶ 39, Ex. 7.

Notwithstanding the pretextual family emergency, Bliss returned to Provo on February 24, when he was not assigned a shift, entered the property for six minutes and was observed entering three different rooms and scanning the areas before leaving, including the Lone Peak Cottage. Marshall Decl. ¶ 40. He also later returned on February 27 to return his keys—when Provo's CEO asked Bliss to come in and talk and asked whether Bliss had anything to disclose, Bliss refused to speak with him and abruptly left the building. Marshall Decl. ¶¶ 42-45.

For reasons described in more detail below, only a temporary restraining order and preliminary injunction can avoid the harms resulting from Bliss's conduct. The Court should grant the application and issue the requested temporary restraining order, order to show cause regarding the preliminary injunction, and expedited discovery order.

## II. LEGAL STANDARD

This application for a temporary restraining order is made pursuant to Fed. R. Civ. P. 65(b). For the court to grant a temporary restraining order, an applicant must meet the same standard required for a preliminary injunction. *Stuber v. Lucky's Auto Credit, LLC*, 478 F. Supp. 3d 1205, 1208 (D. Utah 2020). The applicant "must show (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the [temporary restraining order] is denied; (3) the threatened injury outweighs the harms that the [temporary restraining order] may cause the opposing party; and (4) the [temporary restraining order], if issued, will not adversely affect the public interest." *Id.* (internal citations omitted). Here, Provo is likely to prevail on its claims against Bliss, will inevitably suffer irreparable harm if the relief is denied, the threatened injury far outweighs any potential harm to Bliss, and issuing the relief will actually protect, rather than harm, public interest. Thus, the Court should grant Provo's requested relief.

## III. PROVO WILL PREVAIL ON ITS CLAIMS AGAINST BLISS

In its Complaint, Provo brings seven causes of action against Bliss resulting from his unlawful conduct including, among other things, his fraudulently obtaining a position with Provo, and executing a Confidentiality Agreement in bad faith which he proceeded to breach within days of signing by surreptitiously recording vulnerable, adolescent patients in a psychiatric residential facility. Given the obvious violation of the Federal and state wiretap statutes, Provo has a high likelihood of success prevailing on those claims, as well as the other claims plead in its complaint. Relevant for purposes of this TRO, Provo seeks to now enjoin conduct relating to five of the claims.

**A. Violations of The Wire Tap Statutes**

The Utah Interception of Communications Act and The Omnibus Crime Control and Safe Streets Act of 1968 ("Federal Wiretap Act") (collectively the "Wiretap Acts") prohibit any person from intercepting, using, or disclosing the contents of any oral communication uttered by a person. Oral communication is defined by the Wiretap Acts[2] as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation[.]" *West v. C.J. Prestman Co.*, 2:16-CV-00075-DN, 2017 WL 4621611, *4 (D. Utah Oct. 13, 2017) (citing Utah Code Ann. § 77-23a-3(13) and 18 U.S.C. § 2510–2522). Thus, a plaintiff is required to allege facts showing that "(1) they had an actual, subjective expectation of privacy, and (2) that their expectation of privacy is one that society is willing to recognize as reasonable." *Id.*

Bliss, a filmmaker and activist, entered Provo on several occasions throughout February 12 and February 24 with a baseball cap, sunglasses, and a phony eye condition entitling him to these props. Marshall Decl. ¶¶ 17-18; *see also* Tolman Decl. ¶ 5. He was rarely seen wearing the glasses he purported to need, instead keeping them affixed to his baseball cap. Marshall Decl. ¶ 17. He was further observed fidgeting and angling them toward different spaces at the facility, patients and even angling the glasses toward documents. Marshall Decl. ¶¶ 32, 34. Upon information and belief, this was one of multiple recording devices Bliss unlawfully brought onto

---

[2] Courts have held that a company has standing to sue an employee under the Wiretap Act for recording communications made on the employer's property. *See, e.g.*, *Smoot v. United Transp. Union*, 246 F.3d 633, 640 (6th Cir. 2001):

> "[I]f CSX does not have a possessory interest in the confidential statements made by its Senior Director of Employee Relations, acting as the designated representative for CSX on the PLB, at the executive session portion of a PLB proceeding held on CSX property, regarding grievance adjustments by CSX employees, then it is difficult to conceive of a corporation or association ever having standing under the Act. We find that CSX, as a corporation, had standing to bring its counterclaim as a person whose communication was intercepted and disclosed in violation of the Act under 18 U.S.C. § 2520."

the premises to surreptitiously record patients and staff at Provo, including oral communications he was not a party to and never sought consent to record. *See, e.g.,* Marshall Decl. ¶¶ 18-20, 29, 35.

It's hard to imagine a place where the expectation of privacy could be more clear than in a psychiatric youth treatment center. And there is no doubt society is willing to recognize it as reasonable—indeed there is a litany of privacy laws and protections applicable to patients in psychiatric facilities. Because Provo had an actual, subjective expectation of privacy recognized as reasonable by society, and because Bliss intercepted those private communications, he is in clear violation of the wiretap laws and should be enjoined from possessing and otherwise disseminating any recordings he obtained on the premise.

**B. <u>Breach of Contract</u>**

Under Utah law, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Total Quality Sys., Inc. v. Universal Synaptics Corp*., No. 122CV00167RJSDAO, 2023 WL 4238454, at *3 (D. Utah June 28, 2023); *see also Paparazzi, LLC v. Sorenson*, Case No. 4:22-cv-00028-DN, 2022 WL 1606559, at *1, *3 (D. Utah May 20, 2022) (extending temporary restraining order as a preliminary injunction where plaintiff showed a substantial likelihood of success on its breach of contract claim that defendant had breached confidentiality agreement by sharing confidential business information with third parties).

Upon his hiring, Bliss entered into contracts with Provo containing strict confidentiality provisions, including the Confidentiality Agreement, the Applicant Acknowledgement, and the executed Position Description. He unquestionably breached the confidentiality provisions he agreed to as soon as he entered Provo's premises. *See* Marshall Decl. ¶¶ 17-19, Exs. 1, 2, and 4. Despite agreeing to protect the highly sensitive nature of the work, including following HIPAA

regulations, Bliss infiltrated the school with a hidden camera and surreptitiously recorded and photographed patients and staff members at the facility and various documents containing confidential patient information. *See, e.g.,* Marshall Decl. ¶¶ 18-19, 31, 34. Recording and photographing confidential information and removing it from the facility with the intent to disseminate is in direct breach of Bliss's agreements. (*e.g.*, in the Confidentiality Agreement, Bliss agreed not to "divulge any information" or otherwise "make such information public" concerning person(s) at Provo, and that he is required by "federal and state law to protect the privacy of our current and discharged patients and their treatment while at this facility").

As a direct and proximate cause of the breach, Provo has and/or will suffer economic and irreparable harm caused by Bliss's breaches, including harm to the safety, security, and privacy of Provo patients and staff members. This further includes economic and irreparable harm in being forced to divert resources to combat the HIPAA violations— as a HIPAA covered entity, Provo is required to provide notification of breaches of unsecured PHI. 45 CFR §§ 164.400-414. Upon information and belief, Bliss intends to disseminate the PHI for purposes of his next intended viral video in further breach of his contract. This could harm patients and staff.

### C. **<u>Fraudulent Misrepresentation</u>**

In Utah, a plaintiff may sustain an action for fraudulent misrepresentation when: "(1) [A] representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *Prudential Ins. Co. of Am. v. Sagers*, 421 F. Supp. 3d 1199, 1212 (D. Utah 2019).

Here, Bliss applied for and obtained a position with Provo based on numerous false misrepresentations and omissions. He hid his true purpose for seeking employment: to obtain footage of the facility and its patients. For example, he misrepresented his work history and experience, including, but not limited to, his past job history as a viral film maker and activist. Marshall Decl. ¶¶ 11-12, Ex. 3. He further pretended he needed to wear a baseball cap and sunglasses (which he rarely actually wore) so that he could use the hidden camera affixed the glasses. Marshall Decl. ¶¶ 17-18; *see also* Tolman Decl. ¶ 5, Ex. B. He falsely represented he was interested in a future career in the mental health industry so as to set up an interview with the Provo program manager. Marshall Decl. ¶ 20, Ex. 5. He falsely represented he was monitoring patients in accordance with his job duties when, in actuality, he was interrogating those patients about their experiences at Provo for his footage. Marshall Decl. ¶¶ 35-36. Provo acted in reasonable reliance on the representations made to it, indeed it had no reason to doubt that Bliss wanted to be part of the team committed to serving Provo's patients. Marshall Decl. ¶ 16. Because Bliss induced Provo to hire him based on those false representations, Provo and its patients and staff are now faced with devastating injury and damage, described in more detail below.

### D. <u>Conversion</u>

"A conversion is an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession." *Allred v. Hinkley*, 328 P.2d 726, 728 (Utah 1958).

Here, Bliss received training materials he would not have received but for misleading Provo into hiring him. The only lawful justification for taking the materials would have been if Bliss had sincerely planned to join the staff of Provo, which included upholding the

Confidentiality Agreement. That was never the plan. Instead, Bliss took the training materials unlawfully and for purposes of disseminating the highly sensitive information to the public. In doing so, Bliss has deprived Provo of its use of said materials because, for example, once safety procedures are disseminated to the public they compromise the safety of staff and patients and no longer serve their intended purpose.

**E. <u>Bliss Has No Defenses To The Above Causes of Action</u>**

As detailed above, the evidence supporting each of the claims is clear and undisputable. Provo anticipates that Bliss may seek to assert that the First Amendment precludes this Court from entering the requested injunction. If Bliss asserts such a defense, it fails. The First Amendment does not give Bliss the right to breach contracts or violate wiretapping laws. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 672 (1991) (finding no First Amendment right for the press to disregard an agreement to maintain confidentiality in exchange for information that would be enforceable under state law); *Biles v. Schneider*, 2020 WL 10356508, at * (D. Wyo. Sept. 10, 2020) (rejecting First Amendment challenge to enforcement of non-disparagement clause because defendant raised no material fact dispute regarding the fact that he signed the Settlement Agreement restricting his speech and that this "was a knowing, voluntary and intelligent waiver of his free speech rights regarding [plaintiff]"); *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2016 WL 454082, at *17 (N.D. Cal. Feb. 5, 2016), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623 (9th Cir. 2017) (rejecting defendant's First Amendment defenses to injunctive relief and noting First Amendment rights may be waived by contract). The relief sought merely seeks to enforce nondisclosure agreements and the dissemination of video captured via illegal wiretaps. The First Amendment does not shield Bliss's illegal behavior or prevent this Court from entering an injunction that precludes the dissemination of material collected via that illegal behavior.

## IV. PROVO FACES IRREPARABLE HARM UNLESS INJUNCTIVE RELIEF IS GRANTED

The purpose of a temporary restraining order is "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1074). Irreparable harm "does not readily lend itself to definition" but involves an injury that is "both certain and great"—like the injury posed here by Bliss's conduct. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262-63 (10th Cir. 2004).

First and foremost, if Bliss releases the illegally-recorded films, it will be distributed to a wide audience, especially considering Bliss's past videos have had millions of views. Tolman Decl. ¶¶ 2-4, Ex. A. In that instance, patients' protected health information (PHI), private oral communications, and other confidential information will be posted to the internet—something that can never be undone. The fundamental purpose of the Wiretap statutes is to protect the privacy interests of citizens and the fundamental purpose of Bliss's Confidentiality Agreement is to ensure patients at Provo are protected, including their HIPAA rights. Bliss's imminent release of the illegally-recorded video supplies the irreparable harm necessary to justify a temporary restraining order prohibiting him from publishing or otherwise disseminating the illegal recordings of Provo staff, its patients, patient family members, and others who may have come into contact with Bliss while at the facility.

Second, if Bliss releases the recordings, Provo faces certain irreparable harm to its reputation. Provo exists to help care for minors and keep them safe, and the release of footage from the facility would threaten the trust that residents and their families have in Provo. Releasing this footage would prevent Provo's ability to serve those who depend on its services.

Third, Provo's employees face a safety risk if the film and other materials obtained through Bliss's employment are disseminated to the public. For example, Bliss took with him training materials with procedural and operational information—such as sensitive information that could compromise operations. Marshall Decl. ¶ 25.

The harms to Provo if Bliss were to release the recordings is exactly the "certain and great harm" weighing in favor of a temporary restraining order. If Bliss makes these private materials public, the bell cannot be unrung.

## V. <u>THE BALANCE OF HARMS AND PUBLIC POLICY WEIGHS SIGNIFICANTLY IN PROVO'S FAVOR</u>

As discussed above, Provo faces serious, imminent, and irreparable harm. In contrast to the grave injury facing Provo, an injunction will have no comparable impact on Bliss. Bliss can simply find a different subject matter for his next film—hopefully one that doesn't implicate HIPAA violations at the expense of vulnerable adolescents. And there is no risk of harm in the form of First Amendment violations, as protection of Provo and its residents and staff far outweighs any public policy considerations in disclosure of the footage. Courts have found that, where defendants infiltrate another's property with intent to disregard confidentiality provisions they agreed to and secretly record those on the property, enjoining defendants' breach of confidential material is not against public policy. *See, e.g.*, *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2016 WL 454082, at *20 (N.D. Cal. Feb. 5, 2016), *aff'd sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623 (9th Cir. 2017).

## VI. <u>THE COURT SHOULD PERMIT PROVO TO CONDUCT EXPEDITED DISCOVERY</u>

Under Rule 26, the trial judge has "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). Rule 26(d)

grants a trial court discretion to modify the normal time limits of the discovery rules where the party seeking expedited discovery meets its "burden of showing good cause for the requested departure from usual discovery procedures." *Icon Health & Fitness, Inc. v. Johnson Health Tech N. Amer., Inc.*, 2011 WL 13136539, at *1 (D. Utah Mar. 1, 2011). Courts may make a finding of good cause by "examin[ing] the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Id.* (internal quotations omitted). Here, Provo's request for limited, expedited discovery is unquestionably reasonable.

Regardless of whether the Court grants the requested temporary restraining order, the Court should issue an order under Rules 26 and 34 of the Federal Rules of Civil Procedure permitting Provo to conduct limited discovery on an expedited basis for the purpose of identifying the following limited subjects: (i) all visual and audio recordings Bliss took while at the Provo facility, and any other visual and audio recordings of Provo staff and patients in his possession; (ii) all Provo documents in Bliss's possession, including but not limited to training programming and materials he received during new hire orientation or any other documents received from patients or staff at Provo; (iii) any other materials in Bliss's possession that may contain Provo patient PHI; (iv) discovery relating to Bliss's decision to target Provo and whether he had any persons assisting him with his project; and (iv) the extent to which information has already been disseminated, including upload or transmission to any servers or the cloud.

To pursue these limited topics, Provo requests an order allowing Provo to take the following discovery on an expedited basis (a) the deposition of Robert Bliss no later than 5 court days after the hearing on the Temporary Restraining Order; (b) no more than 10 document requests to which written responses and responsive documents are due within 7 calendar days from the date on which they are served; and (c) inspection rights to inspect the sunglasses, hat,

cell phone and other recording devices he had on the Provo property with him within 5 court days of the hearing on the Temporary Restraining Order.

Here, good cause exists for the Court to grant expedited discovery. Provo has filed a temporary restraining order and preliminary injunction that demonstrates their likelihood of success on the merits of Provo's claims. Provo's request for discovery is narrowly tailored to its claims and are specifically aimed at determining the extent of Bliss's actions underlying the claims. The expedited discovery requests are crucial to Provo's motion while placing minimal burden on Bliss to comply with the requests. Time is of the essence as Provo seeks a speedy resolution of its motion for temporary restraining order and preliminary injunction; further, if this limited discovery does not take place on an expedited basis, there is a risk that evidence could be lost, destroyed, or confidential material publicly disseminated.

Brett L. Tolman
Attorney for Plaintiff